U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2014 APR 28   PM 3: 10

CLERK

BY _____
DEPUTY CLERK

NEW YORK LIFE INSURANCE          )
ANNUITY CORPORATION,             )
                                 )
          Plaintiff,             )
                                 )
     v.                          )        Case No. 5:12-cv-215
                                 )
DAVID C. ASHWORTH and LORI       )
LEAVITT, as Ancillary Administratrix of  )
the ESTATE OF KATHLEEN A. LEAVITT,  )
                                 )
          Defendants.            )

**OPINION AND ORDER DENYING DEFENDANT ASHWORTH'S MOTION
FOR SUMMARY JUDGMENT AND DENYING THE LEAVITT ESTATE'S
CROSS-MOTION FOR SUMMARY JUDGMENT**
(Docs. 41, 45)

Plaintiff New York Life Insurance Annuity Corporation ("New York Life")
commenced this interpleader action to resolve competing claims to the proceeds of an
annuity life insurance policy (the "Policy"). Defendant David C. Ashworth, pursuant to a
power of attorney, and Defendant Lori Leavitt, as ancillary administratrix of the Estate of
Kathleen A. Leavitt (the "Leavitt Estate"), each claim to be the Policy's sole beneficiary.
The court previously granted New York Life's motion to deposit the policy proceeds into
the court's registry and discharged New York Life from this matter. (Doc. 64.) Presently
before the court are Mr. Ashworth's and the Leavitt Estate's cross-motions for summary
judgment. (Docs. 41, 45.) Oral argument was held on January 7, 2014.

Mr. Ashworth is represented by John L. Franco, Jr., Esq. The Leavitt Estate is
represented by Joshua L. Simonds, Esq.

I.      **Factual Background.**

A.      **Undisputed Facts.**

On June 5, 2012, New York Life issued the Policy to Ellen Flanagan with a fixed death benefit in the amount of $129,751.82.  The Policy designated Ms. Flanagan's sister, Kathleen Leavitt, as the sole beneficiary and did not include a contingent beneficiary.

On June 4, 2012, the day before the Policy was issued, Ms. Flanagan executed a power of attorney (the "POA") naming Mr. Ashworth as her attorney-in-fact.  The POA provides that "[t]his instrument is to be construed and interpreted as a General Power of Attorney" and "authorize[s] [the] attorney-in-fact generally to do and perform all matters and things in [Ms. Flanagan's] name with the same powers and to all intents and purposes with the same validity as [she] could if personally present."  (Doc. 24-3 at 1.)  The POA authorizes the attorney-in-fact "[s]ign, execute, acknowledge and deliver on [Ms. Flanagan's] behalf any deed of transfer or conveyance covering personal property or real estate wherever situated . . . owned by [Ms. Flanagan] alone, as well as any owned by [Ms. Flanagan] and [her] spouse jointly," *id.* ¶ 3, and to "[e]xecute, deliver and perform in [Ms. Flanagan's] behalf any contract, agreement or instrument of any nature or kind." *Id.* ¶ 18.  In addition to the enumerated powers, the POA states that:

> In general, I give to my said attorney-in-fact full power to act in the management and disposition of all my estate, affairs and property of every kind and wherever situated in such manner and with such authority as I myself might exercise if personally present.

*Id.* ¶ 21.

Mr. Ashworth accepted the POA by signing an "AGENT ATTESTATION" form[1] four days prior to the date on which the POA was executed by Ms. Flanagan.

---

[1] The "AGENT ATTESTATION" form provides in relevant part:

> I, David C. Ashworth, hereby acknowledge and attest that by signing this Power of Attorney as Agent/Attorney-in-fact, that I:

>> a.      accept the appointment as Agent;
>> b.      understand the duties under the Power of Attorney and under the law;

On June 5, 2012, Mr. Ashworth, acting pursuant to the POA, applied for a Vermont License and Certificate of Civil Marriage on Ms. Flanagan's behalf.  He also signed the marriage license on her behalf.  Five days later, on June 10, 2012, Ms. Flanagan and Mr. Ashworth were married in a civil ceremony by a justice of the peace in Burlington, Vermont.  Following their marriage, on June 16, 2012, Mr. Ashworth submitted a change of beneficiary request to New York Life with a copy of the POA.  Mr. Ashworth requested that he be deemed the primary beneficiary under the Policy, dividing the proceeds as follows: 77% to him and 23% to Kathleen Leavitt.  Ms. Flanagan died shortly thereafter on June 19, 2012.

On or about June 26, 2012, New York Life accepted Mr. Ashworth as Ms. Flanagan's attorney-in-fact, but denied his change of beneficiary request, citing 14 V.S.A. § 3504(f).  Section 3504(f) prohibits the holder of a power of attorney from making a gift to himself or herself of property belonging to the principal unless the terms of the power of attorney explicitly grant the authority to make such a gift.

In this case, the POA addresses gifts of the principal's property as follows:

> **My attorney-in-fact may make gifts of my property to my spouse, my descendants, or any persons named as a beneficiary under my Will.** All gifts to my spouse must qualify for the unlimited marital deduction under Section 2523 of the Code.  All other gifts must qualify for the annual gift tax exclusion under Section 2503(b) and 2503(e) of the Internal Revenue Code (Code), and shall not exceed the amounts allowed as exclusions thereunder.  Gifts pursuant to this power may be made outright or in trust, to a legal guardian or to a custodian of a custodial account.  My attorney-in-fact may also make transfers to any plans authorized by Section 529 of the Code.  **My attorney-in-fact may not make gifts to himself or otherwise expend or utilize my property for his own benefit except for**

---

> c.    understand that I have a duty to act if expressly required to do so in this Power of Attorney consistent with Title 14, Vermont Statutes Annotated, Subsection 3506(c)[;]
>
> d.    understand that I am expected to use my special skills or expertise on behalf of the principal, if the expectation is expressly provided for in this Power of Attorney consistent with Title 14, Vermont Statutes Annotated, Subdivision 3505(a)(6).

*Id.* at 5.

3

> **his health, education, support or maintenance**. My attorney-in-fact may
> satisfy any charitable pledges I may have made and make gifts on my
> behalf to any charitable organization that would qualify as income and gift
> tax charitable deductions. My attorney-in-fact may transfer my property to
> any revocable trust that I have established and may withdraw assets from
> my revocable trust for any purpose authorized under this power of attorney.

(Doc. 24-3 ¶ 20) (emphasis supplied). In rejecting Mr. Ashworth's change of beneficiary
request, New York Life represented that its "position is that the grant of authority in the
[POA] creates an ambiguity that does not satisfy the requirements of 14 V.S.A. § 3504(f)
that the authority to make self-gifts be explicit." (Doc. 24 ¶ 15.)

On July 5, 2012, Kathleen Leavitt submitted a beneficiary claim to New York
Life, requesting the Policy proceeds. New York Life began processing her request "as it
viewed Kathleen Leavitt as the current beneficiary of record under the [P]olicy." *Id.*
¶ 17. Ms. Leavitt died on July 11, 2012, before New York Life completed her claim
request.

On July 24, 2012, Mr. Ashworth submitted a second change of beneficiary
request, seeking to designate himself as the sole beneficiary under the Policy. He also
requested that New York Life reconsider its denial of his first request. Mr. Ashworth
asserted that the POA was created in "anticipation of our marriage." (Doc. 24-5.) Both
requests were subsequently denied, in part because the terms of the Policy prohibited
retroactive changes of beneficiaries after the policyholder dies.

On October 1, 2013, Mr. Ashworth moved for summary judgment, arguing New
York Life wrongfully denied his request to make himself the Policy's primary
beneficiary. (Doc. 41.) On October 31, 2014, the Leavitt Estate cross-moved for
summary judgment, contending that Mr. Ashworth lacked authority to change the
Policy's beneficiary. (Doc. 45.)

### B.    Disputed Facts.

The Leavitt Estate asserts that "due execution" of the POA has not been
established because Mr. Ashworth accepted it prematurely and in violation of its
preparer's alleged directions. The Leavitt Estate further claims that Ms. Flanagan's

signature on the POA "differs markedly" from that which appears on the application for the Policy. (Doc. 45-1 ¶ 4.) The Leavitt Estate points out that if the POA is invalid, so is the marriage certificate and license which Mr. Ashworth signed on Ms. Flanagan's behalf by virtue of the POA. They ask that Mr. Ashworth be dismissed from this case because he has no right to claim the Policy proceeds.

Mr. Ashworth contends that the POA was properly executed, but he does not respond to the assertion concerning Ms. Flanagan's signature. He argues that once New York Life accepted him as Ms. Flanagan's attorney-in-fact under the POA, it waived any argument that the POA's validity was in question.

The parties further dispute Ms. Flanagan's motivation in making Mr. Ashworth her attorney-in-fact. Mr. Ashworth submitted an affidavit from the attorney who prepared the POA in which the attorney states that, in the spring of 2012, Ms. Flanagan and Mr. Ashworth contacted him regarding Ms. Flanagan's serious illness and impeding death. He describes Ms. Flanagan's intentions in executing the POA as follows:

> Ms. Flanagan and Mr. Ashworth had been unmarried partners for a length of time and Ms. Flanagan wanted him to benefit from her only asset that she could not give him outright, the proceeds of a life insurance policy.
>
> Ms. Flanagan had contacted the insurance broker who sold her the policy and arranged to get the forms prepared necessary to have the beneficiary of the policy changed. Ms. Flanagan and Mr. Ashworth were told that she could appoint an agent through a power of attorney and have the agent sign for her. They contacted me to draft the document for them. They also wanted a document that would allow Ms. Flanagan's medical providers to share information on her condition with Mr. Ashworth.
>
> I prepared a power of attorney for Ms. Flanagan appointing Mr. Ashworth her attorney and agent. I also prepared a form allowing her to designate Mr. Ashworth as a person to whom her medical providers could disclose her medical condition and records. I met with Mr. Ashworth on May 31, 2012 and gave him the documents for Ms. Flanagan to review with directions for their execution if she approved.
>
> During the course of [my] discussions with Ms. Flanagan [she] made me aware that she knew she was dying. She also indicated that she believed her sister was also dying and was in nearly as dire circumstances

as Ms. Flanagan was.  Ms. Flanagan indicated that Mr. Ashworth had been of great comfort and assistance to her and she wanted him to benefit from her life insurance policy.  Ms. Flanagan did not believe her sister would benefit from the insurance proceeds due to her impending death.

(Doc. 49-2 ¶¶ 2-5) (numbers omitted).

The Leavitt Estate objects to the court's consideration of the attorney's affidavit as irrelevant and inadmissible hearsay.  It contends that the POA was unnecessary to change the beneficiary under the Policy because Ms. Flanagan could have changed the beneficiary herself.  It further contends that the attorney's affidavit contradicts Mr. Ashworth's statement to New York Life that the POA was made "*in anticipation of our marriage*."  (Doc. 51-1 ¶ 8) (internal quotation marks omitted.)

Mr. Ashworth does not explain how the attorney's affidavit constitutes admissible evidence.  The Leavitt Estate cites no countervailing evidence of Ms. Flanagan's intentions and contends summary judgment is premature because the court lacks a full factual record.

## II.    Conclusions of Law and Analysis.

### A.    Standard of Review.

Summary judgment must be granted when the record shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, (1986) (internal quotation marks omitted).  In deciding the motion, the trial court must resolve all ambiguities and draw all reasonable inferences in favor of the non-moving party, and deny the motion if a rational juror could decide in favor of that party under the applicable law.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  "There is no material fact issue only when reasonable minds cannot differ as to the import of the evidence before the court."  *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 51 (2d

6

Cir. 1993). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"When both sides have moved for summary judgment, each party's motion is examined on its own merits, and all reasonable inferences are drawn against the party whose motion is under consideration." *Chandok v. Klessig*, 632 F.3d 803, 812 (2d Cir. 2011).

### B.    The Leavitt Estate's Cross-Motion for Summary Judgment.

As a threshold matter, the court addresses the Leavitt Estate's challenge to Mr. Ashworth's premature acceptance of the POA because the invalidity of the POA would render the remainder of the parties' arguments moot. The Leavitt Estate contends the POA is void because execution must precede acceptance in order for a power of attorney to be valid under Vermont law. Mr. Ashworth characterizes his premature acceptance as an inconsequential "technical flub" (Doc. 49 at 5) because the applicable statutory language is permissive and because he substantially complied with the statute's requirements.

Title 14, section 3503 of the Vermont Statutes Annotated governs the execution of powers of attorney and provides that "[a] power of attorney shall be signed by the principal in the presence of at least one witness and shall be acknowledged before a notary public, who shall be a person other than the witness." 14 V.S.A. § 3503(a). It further states that "[t]he witness shall affirm that the principal appeared to be of sound mind and free from duress at the time the power of attorney was signed, and that the principal affirmed that he or she was aware of the nature of the document and signed it freely and voluntarily." 14 V.S.A. § 3503(d). With regard to acceptance, the statute provides that "no agent . . . may exercise authority granted in a power of attorney unless the agent has signed the power of attorney, attesting that the agent:

(A)  accepts appointment as agent;

(B)  understands the duties under the power of attorney and under the law;

(C)  understands that he or she has a duty to act if expressly required to do so in the power of attorney . . . ; and

(D)  understands that the agent is expected to use his or her special skills or expertise on behalf of the principal, if the expectation that the agent does so is expressly provided in the power of attorney[.]"

14 V.S.A. § 3503(e)(1)(A)-(D).

Section 3503(e)(2) provides that "[a]n agent may sign at any time after a power of attorney has been executed and before it has been exercised for the first time." 14 V.S.A. § 3503(e)(2).  It thus clearly contemplates that the principal's execution of the power of attorney will precede the agent's acceptance of it.  However, the statute does so in language that is permissive, rather than mandatory, and it provides no consequences for premature acceptance.

The Vermont Supreme Court has held that:

[t]he true rule for the construction of statutes is to look to the whole and every part of the statute, and the apparent intention derived from the whole, to the subject matter, to the effects and consequences, and to the reason and spirit of the law, and thus ascertain the true meaning of the legislature.

*Town of Cambridge v. Bassett*, 453 A.2d 413, 416 (Vt. 1982) (internal quotation marks omitted).  It has repeatedly ruled that "[t]he plain, ordinary meaning of the word 'may' indicates that a statute is permissive, not mandatory." *Franklin Cnty. Sheriff's Office v. St. Albans City Police Dep't*, 2012 VT 62, ¶ 15, 192 Vt. 188, 58 A.3d 207 (internal quotation marks omitted); *see also State v. Goyet*, 122 A.2d 862, 865 (Vt. 1956) (ruling that, in statutory construction, "[w]e can think of no reason . . . why the word 'may' should not be given its ordinary meaning of permission or discretion"); *Joy's Ex'R v. Swanton Sav. Bank & Trust Co.*, 10 A.2d 216, 218 (Vt. 1940) (finding that "[i]t seems clear to us that the word 'may' was used in the act as originally passed and as it now stands in its ordinary meaning of permission only" and that "[i]t cannot be reasonably assumed that the Legislature intended to impose an absolute duty").  "This conclusion is reinforced when the same statute elsewhere employs the mandatory 'shall,' indicating a

conscious decision to grant discretion through use of the alternative 'may.'" *Town of Calais v. Cnty. Road Comm'rs*, 795 A.2d 1267, 1268 (Vt. 2002) (mem.).

Application of the foregoing principles to Vermont's statute governing the execution of a power of attorney reveals that while section 3503 contains certain mandatory provisions, the timing of an acceptance of a power of attorney is not one of them. Instead, the statute's mandatory provisions are confined to those ensuring that the power of attorney is signed by the principal before at least two persons, one of whom must be a notary public, and to ensuring that the principal is of sound mind, free from duress, aware of the nature of the document, and signed it freely and voluntarily. 14 V.S.A. § 3503(a) & (d). By using the mandatory "shall" in these provisions, the statute evinces a clear legislative intent to ensure that principals do not execute powers of attorney unadvisedly or in the absence of certain procedural safeguards.

In contradistinction, the provision governing the agent's acceptance of the power of attorney uses the permissive "may" and merely ensures that the power of attorney will be signed before it has been exercised for the first time. *See* 14 V.S.A. § 3503(e)(2) ("An agent may sign at any time after a power of attorney has been executed and before it has been exercised for the first time."). The statute logically contemplates that the agent will typically sign the acceptance only after the principal has executed the power of attorney, but it does not void the power of attorney if this order is reversed. Moreover, it is clear from the statute's plain language that the purpose of the acceptance requirement is to ensure that the holder of the power of attorney has actually accepted the appointment (as evidenced by his or her signature) and understands the obligations it imposes before the power of attorney is exercised.[2] Premature acceptance does not render the statute's provisions governing acceptance meaningless because it merely means that the holder of

---

[2] This can be particularly important where the power of attorney imposes an affirmative duty to act. *See* 14 V.S.A. § 3506(c) ("If the power of attorney explicitly provides that the agent has a duty to act for the principal as to specified transactions . . . and the agent has specifically acknowledged and accepted such duty to act in signing the power of attorney, the agreement to act on behalf of the principal is enforceable against the agent regardless of whether there is any consideration to support a contractual obligation.").

the power of attorney has accepted his or her responsibilities under the power of attorney in advance of their finalization. Moreover, it does not render the language of the statute meaningless because it remains true that the customary sequence of events is execution of a power of attorney by the principal prior to its acceptance by the agent.

In this case, Mr. Ashworth signed an "AGENT ATTESTATION" form that recites almost verbatim the statutory acceptance language set forth in section 3503(e)(1)(A)-(D). Both the acceptance and the POA originally indicated they were to be signed on May 31, 2012. On the POA, however, this date is crossed out and June 4, 2012 has been substituted in both the principal's signature clause and notary public clause. Mr. Ashworth's acceptance of the POA was attached to and made a part of the POA which ensured that Ms. Flanagan, the witness, and the notary public each had notice of it prior to the POA's execution. If Ms. Flanagan objected to Mr. Ashworth's premature acceptance of the POA, she had the ability to address it by either refusing to sign the POA or choosing a new agent. Accordingly, the statute's intent in protecting against involuntary and ill-informed execution of powers of attorney was not frustrated by Mr. Ashworth's premature acceptance.

For the foregoing reasons, the court concludes that the Vermont Supreme Court would find the timing of an acceptance of a power of attorney under section 3503 permissive rather than mandatory, and would further conclude that the premature acceptance of a power of attorney in the facts and circumstances of this case does not render it void. The Leavitt Estate's cross-motion for summary judgment is therefore DENIED.[3]

### C. Mr. Ashworth's Motion for Summary Judgment.

Mr. Ashworth seeks summary judgment in his favor, arguing that the only ground on which New York Life rejected his change of beneficiary request was its erroneous conclusion that the beneficiary designation was a "gift" under Vermont law which was

---

[3] The Leavitt Estate's challenge to the validity of Ms. Flanagan's signature on the POA was raised in opposition to Mr. Ashworth's motion for summary judgment and will be addressed in that context.

not unambiguously permitted by the POA. He contends that under Vermont law, a change in beneficiary under an insurance policy is not considered a completed gift. In the event it is considered a gift, he asserts that the POA authorizes him to make gifts to Ms. Flanagan's spouse, that he is Ms. Flanagan's spouse, and that both he and Ms. Flanagan intended that the POA serve as a means of ensuring that he would receive the Policy's proceeds.

The Leavitt Estate opposes summary judgment in Mr. Ashworth's favor, not only because it contends the POA is invalid, but also because it contends that Mr. Ashworth's designation of himself as a beneficiary under the Policy constituted prohibited self-dealing. In light of the unusual sequence of events in this case, it asks the court to refrain from ruling on this issue until the parties have developed a full record. The court agrees that disputed issues of fact preclude summary judgment in Mr. Ashworth's favor, but concludes that it remains appropriate to dispose of certain issues as a matter of law.

Under Vermont law, a beneficiary of a life insurance policy generally has no existing property rights because his or her interest in the policy "during the lifetime of the insured [is] a mere expectancy." *Cummings v. Conn. Gen. Life Ins. Co.*, 142 A. 82, 86 (Vt. 1928); *see also Travelers' Ins. Co. v. Gebo*, 170 A. 917, 919 (Vt. 1934) ("Where, as here, a contract of insurance so provides, the beneficiary may be changed at the instance of the insured, and no vested right, but only an expectancy, exists in the beneficiary, in the absence of facts or circumstances tending to establish an equitable interest in the proceeds of the policy."); *Cf. Billings v. Billings*, 2011 VT 116, ¶ 18, 190 Vt. 487, 35 A.3d 1030 (adopting the "near unanimous holdings around the country . . . that a beneficiary's interest under a will is not property before the death of the testator, but instead is only an expectancy that is not subject to the jurisdiction of the family court.").

A "gift" is statutorily defined as "any transfer of anything of value for which consideration of less than fair market value is received." 14 V.S.A. § 3501(7). The Vermont Supreme Court has not squarely addressed whether a beneficiary designation is a "gift" within the meaning of section 3501, and other jurisdictions have taken divergent approaches. *Compare Jones v. Brandt*, 645 S.E.2d 312, 315 (Va. 2007) (finding that a

11

"beneficiary designation" did not "involv[e] the authority of an attorney-in-fact . . . to make a gift of his principal's personal property" because it "conveyed no present interest . . . , but only at best an expectancy"), *with Praefke v. Am. Enter. Life Ins. Co.*, 2002 WI App 235, ¶¶ 15-16, 257 Wis. 2d 637, 655 N.W.2d 456 (treating "beneficiary changes to . . . annuities" as gifts and holding that they are prohibited "unless there is an explicit intent in writing from the principal allowing the gift").

Here, consistent with Vermont Supreme Court precedent, the court predicts Mr. Ashworth's designation of a new beneficiary under the Policy would not constitute a "gift" to himself because the only thing transferred by virtue of that act was a mere expectancy with no present value. As long as Ms. Flanagan remained alive, she could change the beneficiary of the Policy herself and she could revoke the POA that allowed Mr. Ashworth to change it on her behalf. *See* Doc. 24-3 ¶ 26 ("This Power of Attorney shall be binding on me and my heirs, executors and administrators and shall remain in force up to the time of the receipt by my said attorney of a written revocation signed by me."). Accordingly, as a matter of law, the court finds Mr. Ashworth did not receive a "gift" when he attempted to change the Policy's beneficiary and would not have received a gift had he been successful in achieving that change in status.

Moreover, the POA, if valid, clearly authorized Mr. Ashworth to request a change in the Policy's beneficiary on Ms. Flanagan's behalf. *See id.* at 1 ("I authorize my attorney-in-fact generally to do and perform all matters and things in my name with the same powers and to all intents and purposes with the same validity as I could if personally present."); *id.* ¶ 18 (authorizing attorney-in-fact to "[e]xecute, deliver and perform in my behalf any contract, agreement or instrument of any nature or kind"); *id.* ¶ 21 ("In general, I give to my said attorney-in-fact full power to act in the management and disposition of all my estate, affairs and property of every kind and wherever situated in such manner and with such authority as I myself might exercise if personally present.").

Mr. Ashworth's authority under the POA to request a change in the Policy's beneficiary, however, did not thereby automatically permit him to subsequently receive

12

the Policy proceeds pursuant to that beneficiary designation. With regard to the latter, he must establish that his receipt of the Policy proceeds would not run afoul of Vermont's prohibition on self-dealing.

Vermont's statutory scheme governing self-dealing includes "any transaction, including transfer of property of a principal to an agent, that directly or indirectly benefits the agent or the immediate family of the agent, regardless of whether the agent has provided consideration for the transaction." 14 V.S.A. § 3501(11). Accordingly, it includes in its embrace a transaction requesting the change of a beneficiary under a life insurance policy if the agent directly or indirectly benefits from that transaction. Mr. Ashworth's designation of himself as a beneficiary under the Policy thus clearly falls within the statute.

Vermont law provides that an attorney-in-fact must "refrain from self-dealing *except as provided in the power of attorney* pursuant to subsection 3504(d) or (f)." 14 V.S.A. § 3505(a)(2) (emphasis supplied); *see also* 14 V.S.A. § 3504(d) ("No agent may compensate him or herself for duties performed under a power of attorney with funds or property belonging to the principal *unless the terms of the power of attorney explicitly* provide for compensation.") (emphasis supplied); 14 V.S.A. § 3504(f) ( "No agent may make a gift or a loan to him or herself of property belonging to the principal *unless the terms of the power of attorney explicitly* provide for the authority to make gifts or loans to the agent.") (emphasis supplied). "'Terms of the power of attorney' means the specific language contained in a power of attorney." 14 V.S.A. § 3501(13).

Here, the parties point to two different provisions of the POA which appear to be in conflict. Mr. Ashworth points to the POA's provision that states: "My attorney-in-fact may make gifts of property to my spouse, my descendants, or any persons named as a beneficiary under my Will." (Doc. 24-3 ¶ 20.) The Leavitt Estate points to this same paragraph of the POA for a provision that states: "My attorney-in-fact may not make gifts to himself or otherwise expend or utilize my property for his own benefit except for his health, education, support or maintenance." *Id.* Mr. Ashworth does not claim he requested a change in the beneficiary designation for his health, education, support or

maintenance.  If the court gives each of these provisions full force and effect, they produce conflicting results: one that would render Mr. Ashworth's receipt of the Policy proceeds a permissible "gift" to Ms. Flanagan's spouse and the other which would render Mr. Ashworth's receipt of the Policy proceeds a prohibited gift to himself as Ms. Flanagan's attorney-in-fact.  Both of these outcomes are explicitly set forth in the POA.

"Under Vermont law, in a dispute over the interpretation of contract language, the first task of the court is to determine whether the language is ambiguous, which is a question of law." *Mueller v. Mueller*, 2012 VT 59, ¶ 20, 192 Vt. 85, 54 A.3d 168. "Ambiguity arises where the language at issue can be reasonably or fairly susceptible of different constructions." *Chamberlain v. Metro. Prop. & Cas. Ins. Co.*, 756 A.2d 1246, 1248 (Vt. 2000) (internal quotation marks omitted).

In this case, at the time Ms. Flanagan signed the POA, no conflict between the POA's provisions existed.  Instead, it was only when Mr. Ashworth became Ms. Flanagan's "spouse" that the conflict emerged.  Vermont law recognizes that an ambiguity may be created in this manner. *See Isbrandtsen v. N. Branch Corp.*, 556 A.2d 81, 84 (Vt. 1988) (holding that in determining whether an ambiguity exists, "it [is] appropriate . . . for a court to consider the circumstances surrounding the making of the agreement" and observing that "[a]mbiguity will be found where a writing in and of itself supports a different interpretation from that which appears when it is read in light of the surrounding circumstances, and both interpretations are reasonable." ).

Moreover, it is clear that, in the circumstances of this case, where competing explicit provisions of a general power of attorney are in conflict, extrinsic evidence is admissible to resolve the conflict. *See Mueller*, 2012 VT 59, ¶ 20 (holding that "[i]f the contract language is ambiguous, its interpretation is a question of fact to be determined on all the evidence, including extrinsic evidence, to determine the intent of the contracting parties"); *see also Estate of Smith v. United States*, 979 F. Supp. 279, 284 (D. Vt. 1997) ("If a contract provision is ambiguous, the intent of the parties becomes a question for the trier of fact.").  Indeed, Vermont law specifically permits a court to

14

consider "the relevant facts and circumstances" in determining the principal's intent in a general power of attorney like the POA at issue here:

> A general power of attorney created under this subchapter *shall be construed to grant powers that are not expressly delineated in the terms of the power of attorney if it appears from the relevant facts and circumstances that the principal intended the agent to have general authority to act on the principal's behalf with respect to all lawful subjects and purposes.* The specific inclusion or exclusion of one or more powers shall not, by itself, prevent a determination that the principal intended to grant general authority to the agent with respect to subjects not specifically included or excluded.

14 V.S.A. § 3504(a)(2)(emphasis supplied).  Concluding that extrinsic evidence is admissible, the court turns to whether it may resolve the conflict as matter of law in this case. *See Hardingham v. United Counseling Serv. of Bennington Cnty., Inc.*, 672 A.2d 480, 483 (Vt. 1995) (explaining that where an issue is "'generally a question for the jury,' the trial court may decide the question as a matter of law 'where the minds of reasonable persons cannot differ'") (quoting *Rivard v. Roy*, 196 A.2d 497, 500 (Vt. 1963)).

### D.    Whether the Disputed Facts Preclude Summary Judgment.

Mr. Ashworth submits the attorney affidavit in support of his position that Ms. Flanagan intended for the POA to authorize him to receive the Policy proceeds as Ms. Flanagan's spouse.  Although he clearly offers the attorney affidavit for its truth, he does not explain why it constitutes admissible hearsay. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) (observing that the "principles governing admissibility of evidence do not change on a motion for summary judgment" and holding that "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment") (internal quotation marks omitted).

The Leavitt Estate, in turn, contends that the attorney affidavit is inadmissible hearsay and that the facts and circumstances of this case reveal that when Ms. Flanagan purchased the Policy shortly before her death, she clearly intended her sister to be the sole beneficiary.  Had she wanted to change the beneficiary to Mr. Ashworth, she could have done so without a power of attorney.

If the attorney affidavit is considered, the Leavitt Estate points out that it states that the POA was drafted in contemplation of Ms. Flanagan's impending death whereas Mr. Ashworth represented to New York Life that the POA was drafted in anticipation of his and Ms. Flanagan's anticipated marriage. This conflicting evidence undercuts Mr. Ashworth's claim that Ms. Flanagan clearly intended him to receive the Policy proceeds as her spouse. Finally, the Leavitt Estate challenges the validity of Ms. Flanagan's signature on the POA which it claims differs markedly from her signature on the Policy. Drawing all reasonable inferences in favor of the Leavitt Estate, there are genuine issues of material fact which preclude summary judgment in Mr. Ashworth's favor. *See* Fed. R. Civ. P. 56(a) (party seeking summary judgment must "show[] that there is no genuine dispute as to a material fact and the movant is entitled to judgment as a matter of law.").

After a more complete record has been developed, the parties may renew their requests for summary judgment in their favor. *See Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 303 (2d Cir. 2003) (observing that "summary judgment should only be granted if *after discovery*, the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof") (internal quotation marks and brackets omitted); *Sutera v. Schering Corp.*, 73 F.3d 13, 18 (2d Cir. 1995) (reversing summary judgment granted "before any discovery had taken place"); *Meloff v. N.Y. Life Ins. Co.*, 51 F.3d 372, 374 (2d Cir. 1995) (reversing grant of summary judgment in an employment discrimination case where plaintiff had insufficient opportunity "to explore the motivations and reasons for terminating her employment"). Accordingly, Mr. Ashworth's motion for summary judgment is DENIED without prejudice.

## CONCLUSION

For the reasons stated above, the court DENIES the parties' cross motions for summary judgment.  (Docs. 41, 45.)

SO ORDERED.

Dated at Rutland, in the District of Vermont, this 28ᵗʰ day of April, 2014.

Christina Reiss, Chief Judge
United States District Court